1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

ERNIE ARTHUR JAIME,

11                                                          Case No. 1:21-cv-01672-SKO

Plaintiff,

12

v.                                                ORDER ON PLAINTIFF'S SOCIAL
                                                          SECURITY COMPLAINT
13

KILOLO KIJAKAZI,
14    Acting Commissioner of Social Security,[1]

15                    Defendant.                          (Doc. 1)

16

17

18    _____/

19                          **I.        INTRODUCTION**

20         Plaintiff Ernie Arthur Jaime ("Plaintiff") seeks judicial review of a final decision of the

21    Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application

22    for disability insurance benefits ("DIB") under the Social Security Act (the "Act").  (Doc. 1.)  The

23    matter is currently before the Court on the parties' briefs, which were submitted, without oral

24    argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

25

26    _____

27    [1] On July 9, 2021, Kilolo Kijakazi was named Acting Commissioner of the Social Security Administration. *See*
      https://www.ssa.gov/history/commissioners.html.  She is therefore substituted as the defendant in this action.  *See* 42
      U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office
28    of the Commissioner shall, in [their] official capacity, be the proper defendant").
      [2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (*See* Doc. 8.)

## II.    BACKGROUND

Plaintiff protectively filed an application for DIB payments on September 12, 2019, alleging that he became disabled beginning on January 28, 2018, due to a torn rotator, "Biocept," "labrum," and neck injury.  (Administrative Record ("AR") 15, 147–53, 188.)  Plaintiff was born on September 4, 1968, and was 51 years old on the date the application was filed.  (AR 23, 147, 165, 264.)  He has at least a high school education and has past work experience as a corrections officer.  (AR 22, 199–200, 264–65.)

### A.    Relevant Evidence of Record[3]

### 1.    Medical Evidence

Plaintiff sustained an injury to his left shoulder on January 28, 2018, while lifting a heavy linen bag at work.  (AR 656.)  He felt a pop and experienced pain about 30 minutes later.  (*Id*.)  An X-ray of Plaintiff's left shoulder the following day indicated that the glenohumeral and acromioclavicular joints were within normal limits, but revealed calcification along the greater tuberosity compatible with calcific tendinitis and subsegmental atelectasis at the left lung base.  (AR 272.)

An MRI of Plaintiff's left shoulder taken on February 16, 2018, showed several abnormalities: superior rotator cuff calcific tendinitis and tendinosis without full-thickness tearing of several other tendons; and moderate acromioclavicular joint hypertrophic spurring with lateral downsloping of the acromion and small subacromial/subdeltoid bursal fluid/bursitis.  (AR 273–74.)  There was no evidence of displaced labral tear or paralabral cyst, but posterior labral degeneration was noted, and trace fluid was detected within the subacromial/subdeltoid bursa.  (AR 273.)  The coracoacromial and acromioclavicular ligaments were intact, as were the biceps tendon and anchor, and there was no significant fatty replacement or atrophy of the rotator cuff muscles.  (*Id*.)  There was no significant joint effusion or any focal cartilage defect.  (AR 273–74.)

During a visit with orthopedic surgeon Dr. Christian Cameron Safian, M.D., on February 20, 2018, Plaintiff indicated the pain in his left shoulder had been worsening and he felt pain with

---

[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

all extremes of motion and frequently at night.  (AR 656.)  Plaintiff described some neck soreness and indicated that ibuprofen helped minimally.  (*Id*.)  Dr. Safian reviewed the radiology results and determined Plaintiff's primary issue was "frozen shoulder."  (AR 658.)  Dr. Safian recommended "aggressive" physical therapy and icing, and noted that if Plaintiff did not make progress over the next four weeks, they could proceed with an intra-articular cortisone injection.  (*Id*.)

By April 30, 2018, Plaintiff had completed 12 sessions of physical therapy.  (AR 727.)  At a visit that day with Dr. Jere Stahl Ozaeta, M.D., an occupational medicine specialist, Plaintiff reported continued pain in the left shoulder, numbness in the left-hand fingertips, no grasping power with weak left grip, and an inability to elevate the left arm in abductions "'more than an inch.'"  (*Id*.)  Dr. Ozaeta determined that Plaintiff's complaints were more consistent with cervical radiculitis rather than a shoulder injury and requested an MRI to evaluate Plaintiff for radiculopathy.  (AR 727–28.)  Dr. Ozaeta placed Plaintiff on a modified work plan until June 11, 2018, and restricted him to occasionally reaching above the shoulder (up to 25% of shift) and lifting, carrying, pushing, or pulling no more than 20 pounds.  (AR 728.)

At a visit with Dr. Michael Nuzzo, M.D., at Sierra Pacific Orthopedics, on August 14, 2018, Plaintiff described feeling little relief from physical therapy.  (AR 424.)  Dr. Nuzzo noted that Plaintiff's MRI showed a large calcific deposit in the supraspinatus tendon, and that Plaintiff reported significant impartment with activities of daily living, he experienced a seven out of ten pain, and conservative measures such as physical therapy, icing, and anti-inflammatory medications had failed.  (*Id*.)  Dr. Nuzzo also indicated Plaintiff had received a cortisone injection in the left shoulder at the last visit but did not experience relief.  (*Id*.)  Plaintiff's treatment plan moving forward was left shoulder arthroscopic calcific deposit debridement, rotator cuff tear repair, and subacromial decompression.  (AR 425.)

As recommended, Dr. Nuzzo performed this surgery on October 15, 2018.  (AR 419.)  At a post-operative visit on October 23, 2018, Plaintiff reported feeling better, and the surgical wounds appeared to be healing well without signs of infection.  (AR 416–17.)  Plaintiff was to begin physical therapy and/or an at home exercise program.  (AR 417.)  At another post-operative visit on December 4, 2018, Plaintiff reported minimal post-operative pain.  (AR 413.)  Dr. Nuzzo noted

that the involved region had no tenderness and was neurovascularly intact, and the post-operative range of motion was acceptable.  (AR 413–14.)  Plaintiff was to continue with physical therapy.  (AR 414.)

Plaintiff continued reporting that he was doing well and experienced minimal post-operative pain for the next few months.  (*See* AR 408, 410.)  Upon conducting a physical examination on February 27, 2019, Dr. Nuzzo noted that Plaintiff had zero to 175 degree internal rotation of the left shoulder, no significant pain through the arc of motion, and five out of five strength with rotator cuff testing.  (AR 408.)  Accordingly, Dr. Nuzzo discharged Plaintiff from orthopedic care and cleared Plaintiff to return to work as tolerated and participate in activities as tolerated without restriction.  (AR 330, 408.)

Plaintiff completed physical therapy, but returned for a follow-up visit with Dr. Ozaeta on July 8, 2019, complaining of persistent left shoulder discomfort when reaching above shoulder level and an inability to tolerate heavy lifting or constantly reaching above shoulder level when using the left arm.  (AR 330.)  Plaintiff also reported that he did not succeed at returning to work after receiving the surgery.  (*Id.*)  A physical examination indicated reduced range of motion, but no tenderness or deformity.  (*Id.*)  Dr. Ozaeta found that Plaintiff's left shoulder "[was] at maximum medical improvement," and placed Plaintiff on a permanent modified work plan, in that he was restricted to avoiding lifting or carrying over 35 pounds and only occasionally reaching above the left shoulder (up to 25% of shift).  (*Id.*)

On July 9, 2019, California Orthopedic Medical Director Dr. Michael Charles, M.D., interviewed and examined Plaintiff.  (AR 1100.)  Dr. Charles noted deformity of the left biceps consistent with a full-thickness biceps tendon tear and that Plaintiff reported apprehension to forward displacement of the left shoulder with tenderness in the acromioclavicular joint.  (AR 1102.)  Dr. Charles found that Plaintiff had a normal range of motion of the cervical spine and on the right side.  (*Id.*)  Dr. Charles observed that Plaintiff had a "slight decrease in grip strength" on the left side, but noted Plaintiff denied any strength deficits, painful conditions, and stated he did not put out maximum force when performing the test.  (AR 1104.)  Dr. Charles concluded with the following work restrictions:

1
2

> [Plaintiff] is permanently restricted from lifting, pushing, or pulling over 20 pounds. No use of the left shoulder above shoulder level.  No climbing ladders or forceful grasping in regard to the left non-dominant upper extremity.

3   (AR 1117.)  Dr. Charles also recommended consideration of further shoulder surgery due to

4   Plaintiff's complaints of instability and the findings on examination.  (*Id.*)

5           On January 18, 2020, Plaintiff saw Dr. Ozaeta for a follow-up visit and reported increased

6   pain in the left shoulder, especially with internal rotation.  (AR 1559–60.)  Dr. Ozaeta's

7   examination of Plaintiff's left shoulder, however, revealed significant improvement in the range of

8   motion since the examination conducted by Dr. Charles in July of 2019.  (AR 1560.)  Dr. Ozaeta

9   noted no deformity, tenderness, or crepitus as to Plaintiff's left shoulder, as well as no biceps or

10  palmar atrophy, a negative Hoffman's test, and intact sensation to light touch in the arms.  (*Id.*)  Dr.

11  Ozaeta requested authorization for six additional physical therapy sessions and confirmed the work

12  restrictions placed by Dr. Charles.  (AR 1560–61.)

13  **B.      Administrative Proceedings**

14          The Commissioner denied Plaintiff's application for benefits initially on October 24,

15  2019, and again on reconsideration on January 31, 2020.  (AR 15, 80–84, 89–93.)  Consequently,

16  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 15, 96.)

17          On January 5, 2021, Plaintiff appeared telephonically with counsel and testified before an

18  ALJ as to his alleged disabling conditions.  (AR 15, 36–47.)  A vocational expert ("VE") also

19  testified at the hearing.  (AR 15, 47–53.)

20          **1.       Plaintiff's Testimony**

21          At the hearing on January 5, 2021, Plaintiff described his past work experience as a

22  corrections officer, wherein he would be on his feet for 90% of the workday.  (AR 40–41.)

23  Following the injury in January of 2018, Plaintiff worked for three months doing "light duty," but

24  otherwise did not work continuously after being injured.  (AR 39–43.)  Plaintiff stated that he

25  received worker's compensation and was still not working at the time of the hearing.  (AR 39.)

26          Plaintiff testified that he had symptoms on both his left and right side—"[t]he left is

27  recently known but the right is where I get . . . the pain."  (AR 43.)  He stated it was hard to do

28  anything around the house, such as picking up his kids or washing his car, and the left side caused

more limitations than the right side. (*Id.*) Plaintiff testified that he could lift and carry "[m]aybe ten pounds," but could not carry for "too long," and he was unable to do things with his left side such as taking lids off jars, reaching overhead to put something in the cupboard, or using a screwdriver. (AR 43–46.) Plaintiff further stated he would have difficulty having his arms in front of him to type on a keyboard and could only fix meals for the kids for no more than five minutes due to the pain. (AR 44.) Plaintiff testified that he has completed "way beyond the max of physical therapy" and did not anticipate his left shoulder getting better, and his doctors had told him that additional surgeries would be "a shot in the dark" because of "how torn up" his left shoulder was. (AR 46–47.)

Regarding his right arm, Plaintiff testified that he does not have pain other than an occasional "tingle" which prevents him from using his arm, and the last time this tingling sensation occurred was three months prior. (AR 45.)

### 2. VE's Testimony

At the hearing on January 5, 2021, the VE identified Plaintiff's past work experience as a corrections officer, Dictionary of Occupational Titles ("DOT") 372.667-018, specific vocational preparation (SVP)[4] level of 4. (AR 48.) In a first hypothetical, the ALJ asked the VE to assume someone was of Plaintiff's age, education, and work experience, and who is capable of performing light work as defined by the regulations but has the following additional limitations: never climbing ladders, ropes, and scaffolds; never reaching overhead with the left upper extremity; but is capable of frequent reaching in all other directions with the left upper extremity. (*Id.*) The ALJ asked if such an individual could perform Plaintiff's past work, and the VE answered in the negative, explaining that the exertional level of the past work is greater than light work as mentioned in the hypothetical. (AR 48–49.)

The ALJ then asked whether there were other jobs that this hypothetical individual could perform. (AR 49.) The VE testified that such a person could perform the occupations of furniture

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

rental clerk, DOT 295.357-018, SVP 2, with about 105,026 jobs in the national economy; parimutuel ticket cashier, DOT 211.467-018, SVP 2, with about 19,580 national jobs; hotel desk clerk, DOT 238.367-038, SVP 4, with about 241,140 national jobs; and usher, DOT 344.677-014, SVP 2, with about 136,400 national jobs.  (AR 49.)

In a second hypothetical, the ALJ asked whether jobs would exist for someone with the same limitations as those listed in the first hypothetical, but with the exertional level reduced to sedentary.  (AR 49.)  The VE testified that two jobs existed: callout operator, DOT 237.367-014, SVP 2, with 46,320 national jobs; and systems surveillance monitor, DOT 379.367-010, SVP 2, with 113,010 national jobs.  (*Id.*)  In a third hypothetical, the ALJ modified the first hypothetical as follows: the reaching limitations were reduced to occasional reaching with the left upper extremity; the restriction on never reaching overhead was kept; and occasional reaching with the left upper extremity was added.  (AR 49–50.)  The ALJ asked how the jobs identified by the VE in the first hypothetical would be affected.  (AR 50.)  The VE testified that the furniture rental clerk and usher would remain, but the parimutuel ticket cashier would be eliminated.  (AR 50.)

The VE stated that if the same occasional reaching modification was applied to the sedentary hypothetical, the jobs originally identified by the VE would be affected.  (AR 50.)  The VE further testified that employers customarily tolerate one or two days per month of unexcused or unscheduled absences, and up to 10% of the workday is an acceptable amount of time that an employee may be off task before suffering consequences.  (*Id.*)  Lastly, the ALJ asked whether the VE's testimony was consistent with the DOT.  (*Id.*)  The VE answered in the affirmative with the following caveat: "the DOT does not define climbing regarding ladders, stairs, ropes, et cetera, reaching is not specific to any given direction or left/right unilateral, bilateral upper extremities, and the off task requirements and absenteeism rates are not suggested, all of which would be based upon my professional experience."  (*Id.*)

An accredited disability representative then asked the VE a few questions.  (AR 50–53.)  The representative inquired as to whether the jobs initially listed in response to the first hypothetical would be affected if handling with the left upper extremity was reduced to occasionally.  (AR 52.)  The VE stated that all the jobs except for parimutuel ticket cashier would

1  remain unaffected.  (*Id*.)  The representative then asked the VE whether, as to the third

2  hypothetical, which involved occasional reaching except for overhead, but adding occasional

3  handling with the left upper extremity, if any jobs would remain.  (AR 52–53.)  The VE responded

4  in the negative.  (AR 53.)

5  **C.      The ALJ's Decision**

6      In a decision dated February 3, 2021, the ALJ found that Plaintiff was not disabled, as

7  defined by the Act.  (AR 15–24.)  The ALJ conducted the five-step disability analysis set forth in

8  20 C.F.R. § 404.1520.  (*Id*.)  The ALJ decided Plaintiff met the insured status requirements of the

9  Act through December 31, 2024, and he had not engaged in substantial gainful activity since

10  January 28, 2018, the alleged onset date (step one).  (AR 17.)  At step two, the ALJ found Plaintiff's

11  following impairments to be severe: left calcific tendinitis, osteoarthritis, cervical radiculitis,

12  obesity, and left rotator cuff syndrome.  (*Id*.)  Plaintiff did not have an impairment or combination

13  of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

14  Subpart P, Appendix 1 ("the Listings") (step three).  (AR 17–18.)

15      The ALJ next assessed Plaintiff's residual functional capacity ("RFC") and applied the

16  assessment at steps four and five.  *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three

17  to step four, we assess your [RFC] . . . .  We use this [RFC] assessment at both step four and step

18  five when we evaluate your claim at these steps.").  The ALJ determined Plaintiff had the RFC:

19      to perform light work as defined in 20 [§] CFR 404.1567(b) except: no climbing
    ladders, ropes, or scaffolds; no overhead reaching with the left upper extremity; and
20      limited to frequent reaching with the left upper extremity.

21  (AR 18.)[5]  Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected

22  to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely

23  consistent with the medical evidence and other evidence in the record."  (AR 21.)

24      The ALJ found that Plaintiff is unable to perform any past relevant work (step four).  (AR

25  22–23.)  The ALJ concluded that Plaintiff was not disabled from January 28, 2018, through the

26

27  [5] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. §§ 404.1567(b), 416.967(b).  Although the weight lifted may be very little, a job is in
28  this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  *Id.*

8

date of the decision.  (AR 24.)  Listing the jobs of furniture rental clerk, parimutuel ticket cashier, and usher, as noted by the VE at the hearing, the ALJ reasoned as follows:

> Based on the testimony of the [VE], the undersigned concludes that, considering [Plaintiff's] age, education, work experience, and [RFC], the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

(AR 23-24.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 14, 2021.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

### III.      LEGAL STANDARD

**A.      Applicable Law**

An individual is considered "disabled" for purposes of disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  However, "[a]n individual shall be determined to be under a disability only if [their] physical or mental impairment or impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the [Act]."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.  The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of

performing [his or her] past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue [his or her] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.   Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097.  "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  "'Substantial evidence is more than a mere scintilla but less than a preponderance.'" *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  Additionally, "'[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation.'" *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020); *see, e.g.*, *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for

that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  The Court must instead determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'"  *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts may not reverse an ALJ's decision on account of an error that is harmless.  *Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017).  Harmless error "exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks omitted).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

## IV.     DISCUSSION

Plaintiff contends that the ALJ erroneously failed to offer legitimate reasons for rejecting his subjective complaints and failed to incorporate work-related limitations in the RFC consistent with the nature and intensity of Plaintiff's symptoms.  (Doc. 15 at 3, 9–15.)  For the reasons stated below, the Court finds the ALJ did not err.

### A.     The ALJ's RFC Determination is Supported by Substantial Evidence

#### 1.     Legal Standard

The nature of the ALJ's responsibility is to interpret the evidence in the record, including medical evidence.  *See, e.g., Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  Such a responsibility does not result in the ALJ committing legal error when the ALJ assesses an RFC that is consistent with the record.  *See Mills v. Comm'r of Soc. Sec.*, No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 (E.D. Cal. Aug. 22, 2014).

An RFC "is the most [one] can still do despite [one's] limitations" and it is assessed "based

on all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of evidence.  20 C.F.R. § 416.945(a)(1).  "It is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine [RFC]."  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  Further, an ALJ's RFC determination need not precisely reflect any particular medical provider's assessment.  *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (the ALJ properly incorporated physician's observations in the RFC determination while, at the same time, rejecting the implication that the plaintiff was unable to "perform simple, repetitive tasks in an environment without public contact or background activity").

In evaluating the credibility of a claimant's testimony regarding their impairments, an ALJ must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the alleged symptoms.  *Id*.  The claimant is not required to show that their impairment could reasonably be expected to cause the severity of the symptom they have alleged; they need only show that it could reasonably have caused some degree of the symptom.  *Id*.  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if they give "'specific, clear and convincing reasons'" for the rejection.  *Id*.

As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009) ("If an ALJ finds a claimant's characterization of his or her own symptoms unreliable, the ALJ must make a credibility determination backed up by specific findings.").  Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he or she complains.  *Light v. Soc. Sec. Admin.*, 119

1   F.3d 789, 792 (9th Cir. 1997)

2       The clear and convincing standard is "not an easy requirement to meet," as it is "'the most

3   demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir.

4   2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  General

5   findings are not sufficient to satisfy this standard; "'rather, the ALJ must identify what testimony

6   is not credible and what evidence undermines the claimant's complaints.'"  *Burrell v. Colvin*, 775

7   F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

8       **2.      Analysis**

9       Here, Plaintiff asserts that the ALJ erred in failing to provide "clear and convincing" reasons

10  for discounting his complaints of symptoms as to restrictions in using the left upper extremity on a

11  repetitive basis and performing grasping and handling with the left hand.   (Doc. 15 at 10.)

12  Specifically, Plaintiff asserts that the ALJ failed to address his complaints of pain as they appear in

13  the medical records by cherry-picking evidence unfavorable to Plaintiff while ignoring favorable

14  evidence.  (*Id*. at 11–12.)

15      The ALJ acknowledged Plaintiff unsuccessfully attempted to work after the alleged

16  disability onset date, and that Plaintiff again attempted to return to work after completing a surgery

17  on the left shoulder but was unable to continue working because of his impairments.  (AR 17.)  In

18  considering Plaintiff's symptoms, the ALJ's analysis focused on whether Plaintiff had an

19  underlying medically determinable physical or mental impairment that could reasonably be

20  expected to produce his pain or other symptoms.  (AR 19.)  After carefully considering the

21  evidence, including records of treatment Plaintiff received for the left shoulder (AR 19–21), the

22  ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected

23  to cause the alleged symptoms (AR 21).  The ALJ, however, found Plaintiff's statements as to the

24  "intensity, persistence, and limiting effects of his symptoms" to be "inconsistent" "because the

25  evidence [did] not show debilitating functional limitations."  (AR 21.)

26      The ALJ's finding as to Plaintiff's credibility regarding the severity of his symptoms is

27  supported by the record in this case.  At the hearing, Plaintiff testified that he experienced

28  symptoms on both his left and right side, but the left side caused more limitations than the right

side.  (AR 43.)  As for the left side, specifically his left upper extremity, Plaintiff stated he could carry up to 10 pounds for short periods of time, but was unable to do tasks such as taking lids off jars, reaching overhead, or using a keyboard.  (AR 43–46.)  Plaintiff testified that it appeared unlikely additional treatment on his left shoulder, such as further surgeries, would result in improvement.  (AR 46–47.)  Regarding the right side, Plaintiff stated he had occasional tingling which prevented him from using his arm.  (AR 45.)

In evaluating a claimant's claimed symptoms, an ALJ may find a plaintiff less credible when his or her symptoms can be controlled by treatment and/or medication.  *See* 20 C.F.R. § 416.929(c)(3)(iv)–(v); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.").  But, the Ninth Circuit has explained how,

> [a]s we have emphasized while discussing mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.  Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

*Garrison*, 759 F.3d at 1017.

Here, the ALJ did not discredit Plaintiff merely due to waxing and waning symptoms.  Instead, To the contrary, the ALJ stated as follows:

> [Plaintiff] had a significant injury to his left shoulder, and he had extensive treatment, including injections, physical therapy, and ultimately, surgery.  His physical examinations following surgery showed some improvement, but he continues to have some residual symptoms, including decreased range of motion.  However, he does not have atrophy in his left upper extremity, and there is no evidence of any significant decrease in strength.  His right upper extremity appears to be normal.

(AR 21.)

There is substantial evidence in the record that Plaintiff's physical conditions improved with treatment during the relevant period.  For example, at a visit with Dr. Nuzzo on August 14, 2018, Plaintiff described feeling little relief from physical therapy and experiencing a seven out of ten pain, leading Dr. Nuzzo to conclude that conservative measures such as physical therapy, icing, anti-inflammatory medications, and a cortisone injection had failed.  (AR 424.)  After Dr. Nuzzo

performed surgery on Plaintiff's left shoulder and Plaintiff completed physical therapy, Plaintiff presented with minimal post-operative pain, no tenderness, and improved range of motion.  (AR 408, 410, 414.)  On February 27, 2019, Dr. Nuzzo noted that Plaintiff had improved internal rotation of the left shoulder, no significant pain through the arc of motion, and five out of five strength with rotator cuff testing.  (AR 408.)  Accordingly, Dr. Nuzzo discharged Plaintiff from orthopedic care and cleared Plaintiff to return to work and activities as tolerated without restriction. (AR 330, 408.)

Plaintiff continued reporting pain in the left shoulder and limitations such as reaching overhead.  (AR 330.)  Dr. Charles observed that Plaintiff had a "slight decrease in grip strength" on the left side, but noted Plaintiff denied any strength deficits, painful conditions, and stated he did not put out maximum force when performing the test.  (AR 1104.)  Thus, Dr. Charles restricted Plaintiff permanently from lifting, pushing, or pulling over 20 pounds, using the left shoulder above shoulder level, climbing ladders, or forceful grasping.  (AR 1117.)  Though Plaintiff reported increased pain in the left shoulder on January 18, 2020, Dr. Ozaeta's examination revealed significant improvement in the range of motion since the examination conducted by Dr. Charles in July of 2019, no deformity, tenderness, or crepitus as to Plaintiff's left shoulder, and intact sensation to light touch in the arms.  (AR 1559–61.)

Having considered the evaluations of these various treating medical professionals, the ALJ formulated Plaintiff's RFC, which included a slightly more restrictive limitation to exertional activity than that found by the opining physicians and was consistent with the VE's testimony at the hearing.  As noted above, Dr. Charles restricted Plaintiff as follows:

> [Plaintiff] is permanently restricted from lifting, pushing, or pulling over 20 pounds. No use of the left shoulder above shoulder level.  No climbing ladders or forceful grasping in regard to the left non-dominant upper extremity.

(AR 1117.)  These work restrictions were confirmed by Dr. Ozaeta.  (AR 1560–61.)  Similarly, the ALJ determined Plaintiff had the RFC:

> to perform light work as defined in 20 [§] CFR 404.1567(b) except: no climbing ladders, ropes, or scaffolds; no overhead reaching with the left upper extremity; and limited to frequent reaching with the left upper extremity.

(AR 18.)

The ALJ's formulation of Plaintiff's RFC also comports with the VE's testimony. The ALJ acknowledged that Plaintiff's ability to perform all or substantially all of the requirements of the full range of light work "has been impeded by additional limitations." (AR 23.) At the hearing, to determine the extent to which these limitations eroded the unskilled light occupational base, the ALJ asked the VE whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC. (AR 48–49; *see also* AR 23.) The VE testified that given the limitations of never climbing ladders, ropes, and scaffolds, never reaching overhead with the left upper extremity, but with frequent reaching in all other directions with the left upper extremity, such an individual would be able to perform the requirements of representative occupations such as furniture rental clerk, parimutuel ticket cashier, hotel desk clerk, and usher, all of which existed in significant numbers in the national economy. (*Id.*) If the individual's exertional level was reduced to sedentary, the VE testified that jobs such as callout operator and systems surveillance monitor were available. (AR 49.) Even if the first hypothetical was modified such that the reaching limitations were reduced to occasional reaching with the left upper extremity, the restriction on never reaching overhead remained, and occasional reaching with the left upper extremity was added, the VE testified that jobs such as furniture rental clerk and usher would remain. (AR 49–50.) When asked by the representative whether the jobs initially listed in response to the first hypothetical would be affected if handling with the left upper extremity was reduced to occasionally, the VE stated that all the jobs except for parimutuel ticket cashier would remain unaffected. (AR 52.) Only when the limitation of occasional handling with the left upper extremity was added did the VE testify that no jobs would remain. (AR 52–53.) The ALJ further determined that the VE's testimony was consistent with the DOT. (AR 24.)

The ALJ's conclusion that Plaintiff's statements as to the severity and limiting effects of his symptoms were "inconsistent" because the evidence failed to show "debilitating functional limitations" (AR 21) is also supported by the medical record. One of many factors that the ALJ may consider in weighing a claimant's credibility as to the characterization of his or her symptoms is prior inconsistent statements. *Tommasetti*, 533 F.3d at 1039; *Bray*, 554 F.3d 1226–27. For example, following surgery, Dr. Nuzzo discharged Plaintiff from orthopedic care and cleared

1   Plaintiff to return to work as tolerated and participate in activities as tolerated without restriction.

2   (AR 330, 408.)  Despite Plaintiff's continued complaints of discomfort and limitations, Dr. Ozaeta

3   found that Plaintiff's left shoulder "[was] at maximum medical improvement," and placed Plaintiff

4   on a permanent modified work plan, in that he was restricted to avoiding lifting or carrying over

5   35 pounds and only occasionally reaching above the left shoulder (up to 25% of shift).  (AR 330.)

6   Dr. Charles also observed that Plaintiff had a "slight decrease in grip strength" on the left side, but

7   noted Plaintiff denied any strength deficits, painful conditions, and stated he did not put out

8   maximum force when performing the test.  (AR 1104.)  Similarly, at the hearing, Plaintiff testified

9   that he had symptoms on both his left and right side, describing how "[t]he left is recently known

10  but the right is where I get . . . the pain."  (AR 43.)  Later during the hearing, however, Plaintiff

11  testified that he had occasional tingling in his right arm which prevented him from using it.  (AR

12  45.)  Dr. Charles found that Plaintiff had had a normal range of motion of the cervical spine and on

13  the right side.  (AR 1102.)

14       Accordingly, the ALJ properly formulated Plaintiff's RFC, taking into account records from

15  multiple treating physicians demonstrating improvement with treatment and indications as to the

16  lack of reliability of Plaintiff's complaints regarding the debilitating effects of his symptoms.  *See*

17  *Mills*, 2014 WL 4195012, at *4 (finding argument that the ALJ was improperly attempting to "play

18  doctor" to be without merit where the ALJ "carefully analyzed the various medical opinions,

19  treatment records, and [the] plaintiff's own testimony in formulating an RFC."); *see also* 20 C.F.R.

20  § 404.1527(d)(2) ("the final responsibility for deciding [an RFC] is reserved to the

21  Commissioner"), § 404.1545(a)(1) ("We will assess your [RFC] based on all the relevant evidence

22  in your case record."); *see, e.g.*, *Mills*, 2014 WL 4195012, at *4 ("Indeed, [P]laintiff can hardly

23  fault the ALJ for giving him the benefit of the doubt and assessing an RFC that is more favorable

24  to [P]laintiff than most of the medical opinions in the record.").

25       Plaintiff contends that the ALJ improperly failed to include limitations assessed by the

26  physicians in the RFC and thus, the ALJ should have found a closed period of disability.  (*See* Doc.

27  15 at 14–15.)  As set forth above, however, the ALJ's decision accounted for the opinions of

28  multiple medical professionals indicating improvement with treatment, included a similar

limitation to exertional activity as that found by Dr. Charles, and was consistent with testimony from the VE (*see* AR 18, 23, 48–53, 1117).  *See Mills*, 2014 WL 4195012, at *4 ("it is the ALJ's responsibility to formulate an RFC that is based on the record *as a whole*, and thus the RFC need not exactly match the opinion or findings of any particular medical source.") (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (original italics)).  Plaintiff appears to be advocating for an alternative interpretation of the evidence regarding how pain affected his ability to use the left upper extremity.  (*See* Doc. 15 at 10–12.)  The Court will not second-guess the ALJ's reasonable interpretation, even if such evidence could give rise to inferences more favorable to Plaintiff.  *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

As there is substantial evidence of Plaintiff's improvement with treatment and lack of reliability as to Plaintiff's characterization of his symptoms, such are clear and convincing reasons for not finding Plaintiff's subjective complaints to be fully credible.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599–600 (9th Cir. 1999) (the ALJ's adverse credibility determination properly accounted for physician's report of improvement with medication); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming denial of benefits and noting that claimant's impairments were responsive to treatment).   While Plaintiff may disagree with the ALJ's interpretation of the medical evidence, it is not within the province of this Court to second-guess the ALJ's reasonable interpretation of that evidence, even if such evidence could give rise to inferences more favorable to Plaintiff.  *See Rollins*, 261 F.3d at 857; *Ford*, 950 F.3d at 1159 ("Our review of an ALJ's fact-finding for substantial evidence is deferential," and "our inquiry 'defers to the presiding ALJ, who has seen the hearing up close'").

## V.      CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is

//

//

//

//

therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 9, 2023**                                     /s/ *Sheila K. Oberto*

                                                          UNITED STATES MAGISTRATE JUDGE